## Case No. 11,171.

### PINTARD v. GOODLOE.

[Hempst. 502.] [1]

Circuit Court, D. Arkansas. April 10, 1847. [2]

VENDOR AND PURCHASER—PURCHASER'S ACQUIRING
BETTER TITLE—POSSESSION—VENDOR'S LIEN.

1. The vendor and vendee, and the purchasers from the vendee, stand in the relation of landlord and tenant, and neither the vendee nor those claiming under him, are permitted to disavow the vendor's title.

2. If they buy up a better title, or an outstanding title, where the vendor has been guilty of no fraud, it will enure to the benefit of the vendor, and he can only be compelled to refund the amount paid for the better title.

3. Where a vendee enters into possession under the vendor, he will not be suffered to dispute the title of the latter, unless he yields up the possession.

4. A vendor has a lien on the land for the purchase-money against the vendee, his heirs, privies in estate, and purchasers.

5. This lien rests on the principle, that a person having acquired the estate of another, as between them, ought not in conscience to be allowed to keep it and not pay the consideration money; and the lien attaches as a trust, whether the land be actually conveyed or contracted to be conveyed.

6. A third person, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it, without making such payment, for it attaches to him also as a matter of conscience and duty.

7. Where P. in the possession of public land, and having a right of preëmption thereto, sold such land to R., who afterwards sold to G., and the latter agreed with R. to pay P. the purchase-money when P. should make him a good title, and G. afterwards, by virtue of his possession, was able to and did obtain title in his own name, and then refused to pay P. the purchase-money, *held* that G. was responsible to P. for the purchase-money, and that P. also had a lien on the lands therefor, and which were decreed to be sold to discharge it.

---

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed in 12 How. (53 U. S.) 24.]

Bill in equity determined in the circuit court.

S. H. Hempstead, for complainant.

The case, as made out in the bill, is mostly admitted in the answer of [Archibald W.] Goodloe, and such allegations as he has denied have been proved,—fully and conclusively proved. But Goodloe denies the equity of the bill, resting his defence principally, if not entirely, on the ground that, when [John M.] Pintard sold the lands mentioned in the bill to William Rodes on the 23d day of May, 1835, he had no title thereto,—was a mere trespasser; "inasmuch," says his answer, "as he, Pintard, never settled on said land in time to be entitled to preëmption under the act of the year 1834" [4 Stat. 678], thus conceding, if such settlement was made, that Pintard had a title, subject to sale.

As far as the south-west quarter of section six is concerned, there is no contest as to title. The contest arises upon the south-east quarter of section one, township eighteen south, range one west, containing 168⁹⁶/₁₀₀ acres. This tract of land was originally claimed by Jane Mathers, by virtue of occupation and cultivation, under the preëmption act of the 12th of April, 1814. 3 Stat. 122, § 5. She assigned to Thomas T. Tunstall, and he, as her legal representative, her assignee, purchased it, in due form of law, at the Little Rock land-office, on the 24th of July, 1834, and obtained a patent certificate therefor. On the 24th of February, 1838, without any notice, or any judicial proceeding of any kind, this purchase was ordered to be cancelled by the commissioner of the general land-office, and the purchase-money refunded, on the ground that it was not government land, until the ratification of the Quapaw treaty, on the 24th of August, 1818. It was certainly a strong exercise of power in the commissioner to set aside this entry. Rights had grown up under it; Tunstall, the vendor, and Pintard, his vendee, were resting securely upon it; and it would seem just that some sort of notice should have been given to them, and their rights taken away, if at all, by some kind of formal proceeding, affording an opportunity to be heard. Passing this over, however, I will merely refer to an act of congress of March 1, 1843 (5 Stat. 603) the 3d section of which was intended to confirm claims, under the preëmption act of 1814, to lands south of the Arkansas river, and would be construed, I suppose, to have that effect. It operated by way of confirmation; and certainly, if Pintard had not sold, and had retained the possession of the land, this act alone would have given him a title against all the world, irrespective of the preëmption acts subsequent to 1814; especially the act of 1834, under which he had a perfect right of preëmption to this land, as is amply demonstrated by the proof. Pintard, however, does not entirely rest his right to relief on the validity of the preëmption of Jane Math-ers, under the act of 1814; he occupies other ground, and I only refer to that as a part of the history of the case,—a link in the chain of events connected with his title, of no inconsiderable importance.

This tract of land was in fact purchased by Pintard of Tunstall, in the spring of 1833; (the bond of 1834 having been substituted for a previous one;) possession was taken by Pintard through an agent, and the improvement and cultivation thereof commenced, as shown by the evidence, in the spring of that year. The tract is referred to by some of the witnesses as the "first quarter below the meridian line," and was improved and cultivated by Pintard, through agents and his slaves, in 1833, until he removed there himself with his family in the autumn of that year. In December, 1833, I say he was there in person, had ten or twelve slaves on the place, engaged under his own superintendence in clearing land and making fences, and from that time forward, until the sale to Rodes, Pintard improved and cultivated the south-west quarter of section 1, and built houses, cabins, stables, and other fixtures. Early in the spring of 1834, seventy-five or eighty acres of this land had been cleared, and was ready for planting; and upon which he raised corn and cotton that year. He was in possession of it on the 19th June, 1834; was a settler and occupant of it prior to that time, and cultivated it in 1833; thus fully entitling himself to a right of preëmption under the act of June 19, 1834 (4 Stat. 678).

The right of Pintard to a preëmption under this act, is most clearly and conclusively established by the proof. On the 23d March, 1835, he sold this south-west quarter of section 1, and a portion of the south-west quarter of section 6, to a conditional line, supposed to contain together about 200 acres, at the rate of forty dollars per acre, to William Rodes, and Rodes gave his two notes therefor, bearing ten per cent. interest. There were at least eighty acres cleared and fit for cultivation; there were valuable and permanent improvements thereon, put there by the capital and labor of Pintard, and consisting of the buildings and tenements necessary to a plantation; and the land is proved to have been the best in the country, and to have been worth the price agreed to be paid for it per acre. There could be no stronger proof of the fact than the sale by Rodes to Goodloe of this identical land, on the 13th March, 1837, not quite two years afterwards, for sixty-five dollars per acre—an advance of more than fifty per cent on the cost of it. Rodes obtained the peaceable and quiet possession of this land by virtue of the sale made to him by Pintard; and Goodloe expressly admits, in his answer, "that he received possession of both of the said tracts from said Rodes, who received it from said Pintard, and that, by virtue of that possession, he became entitled to a preëmption," under the act of June 22, 1838. In the contract be-

tween William Rodes and Archibald W. Goodloe, of the 13th March, 1837, the land purchased from Pintard is expressly referred to, and the purchase-money due from Rodes to Pintard reserved in the hands of Goodloe, and to be paid by him upon obtaining regular title. Thus Goodloe stepped into the shoes of Rodes, and with his eyes open, and with full notice, assumed, under hand and seal, the payment of the purchase-money to Pintard,—assumed it as a part of the consideration of the contract just alluded to. On the 15th February, 1839, Goodloe proved up a preëmption in his own name, under the act of June 22d, 1838, to the south-east fractional quarter section one, township eighteen south, range one west, containing $168^{00}/_{100}$ acres, at the land office in Helena, Arkansas.

The bill alleges that Goodloe assured Pintard that he desired nothing more than to perfect his title, and that he was bound and would pay the purchase-money due to Pintard. I beg leave to call the attention of the court, in passing along, to a portion of the answer of Goodloe, in response to this allegation. It is denied, in the face of six of his letters to Pintard, commencing the 6th of January, 1840, and ending the 26th of October, 1841. In three of them the preëmption is expressly referred to. "I will," says he, in the letter of May 1, 1840, "have no difficulty in obtaining the preëmption." In a letter of November 10, 1840, he says: "I have not, as yet, been able to get the land-office department to act on the preëmption for the quarter of land you sold Rodes." I shall not critically analyze these letters, but merely add that all of them contain assurances, promises to pay money to Pintard, either directly or indirectly, upon this preëmption or tract of land. Now Goodloe felt himself obliged to admit that the money spoken of in those letters was the purchase-money due by Rodes to Pintard; but to destroy the effect of this admission and forgetting the inconsistency into which he would fall, he proceeds to refer these promises, and this money so due, to the fractional part of section six, which he informs us did not contain more than ten or eleven acres! Say it was eleven acres; that would amount, at $40 per acre, to $440, although he puts it at one half of that sum, but on what data we are not informed. On the 28th May, 1838, he paid to Pintard, for Rodes. $600, and on the 31st May, 1839, the further sum of $1,363.82, making an aggregate payment up to that time of $1,963.82! According to his account, it not only required near two thousand dollars to discharge four hundred and forty, but further means were required, and to which we must add the trouble of more than a year's correspondence! If his answer is to be credited, he had, on the 31st May, 1839, paid for this eleven acres of section six more than four times over! His answer avers, that "he never made any promises to pay said Pintard than are contained in said letters, and than

are stated in his said original answer; and he admits that the money spoken of in said letters was the money due by said Rodes to said Pintard for the purchase of said fractional part of section six, but not for the residue of said lands; which money this respondent had agreed to pay, and never did refuse to pay!" Strange as it may appear, yet it is certainly true, that exhibits C. and D., appended to his original answer and made part thereof, (being vouchers for these payments,) both show that the amounts paid as above stated were regarded and received as partial payments of the purchase-money due for the land sold by Pintard to Rodes, and were credited upon the notes of Rodes held by Pintard, securing the purchase-money.

The agreement on the part of Goodloe, to pay the purchase-money to Pintard, was founded upon a valuable consideration, and necessarily enured to the benefit of the latter, and upon which he might seek a remedy, although the contract was between Rodes and Goodloe alone. Pigott v. Thompson, 3 Bos. & P. 149; Chit. Cont. (5th Ed.) 53; Marchington v. Vernon, 1 Bos. & P. 101, in notes: Martyn v. Hind, Cowp. 438; Dutton v. Poole. 2 Lev. 210; 1 Vent. 318. A preëmption right is property, so regarded by the government and the community at large. In Arkansas, "all improvements on the public lands of the United States are subject to execution." Rev. St. 377. To call a settler upon the public lands a "trespasser," is an outrage upon a policy of the government which has been steadily pursued for more than twenty-five years.

The great point, to which the others are subordinate is, that Goodloe obtained the possession of both parcels of land through Pintard, and by a recognition of his title. By means of that possession, Goodloe was enabled to obtain a preëmption to the principal tract, and which he could not have obtained if Pintard had not sold to Rodes, and Rodes to Goodloe. This fact is admitted in his answer; and indeed it is perfectly manifest that, if Pintard had remained in possession, he could and would have obviated any defect in his title, by availing himself of some confirmatory act of congress, or of the later preëmption acts, i. e. of 1834 or 1838. It was not competent, therefore, for Goodloe to disavow the title of Pintard, because they stood in the relation of landlord and tenant. The purchase of Goodloe from Rodes was made on the 13th of March, 1837. The preëmption of 1814 was ordered to be cancelled on the 28th February, 1838, while Goodloe was in possession; and it was worth while to observe that one of the reasons for allowing him to enter the tract he did, under the act of 1838, was, that he alleged "himself to be the purchaser from the individual who made the first-mentioned entry." It is not pretended that Pintard was guilty of any fraud, or that Rodes was guilty of any; and, if there was

fraudulent conduct, this court will be obliged to attribute it to Goodloe. Of that I say nothing, because the case, as I view it, does not demand it.

The principle stated by the supreme court, in Galloway v. Finley, 12 Pet. [37 U. S.] 295, most strongly and pointedly applies: "That if the vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of money paid for the better title." Searcy v. Kirkpatrick, Cooke (Tenn.) 211; Mitchell v. Barry, 4 Hayw. (Tenn.) 136. See Morgan's Heirs v. Boone's Heirs, 4 T. B. Mon. 297. Both the cases of Galloway and Searcy, above cited, must, I think, be regarded as conclusive upon the present. There is, indeed, a strong analogy between the three,—a similarity not often found to exist,—with this difference, as it appears to me, that in the one at bar there are more equitable circumstances in favor of the vendor, and demanding the interposition of a court of equity, than in the others. In the case in 12 Pet. [supra], the court further declare, that "in reforming the contract, equity treats the purchaser as a trustee for the vendor, because he holds under the latter; and acts done to perfect the title by the former, when in possession of the land, enure to the benefit of him under whom the possession was obtained, and through whom the knowledge that a defect in the title existed was derived. The vendor and vendee stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title." Willison v. Watkins, 3 Pet. [28 U. S.] 45; Connelly's Heirs v. Chiles, 2 A. K. Marsh. 242; Wilson v. Smith, 5 Yerg. 398; Blight's Lessee v. Rochester, 7 Wheat. [20 U. S.] 547. The vendor will be obliged to make an abatement in the purchase-money equal to what it cost to clear the title. Officer v. Murphy, 8 Yerg. 502; Meadows v. Hopkins, 1 Meigs, 181; Marshall v. Craig, 1 Bibb, 396. No court will allow a vendee to pry into and discover defects in his own title, with a view to purchase an outstanding claim, to the prejudice of the vendor. He may perfect his title, it is true, but then it must enure to the benefit of the vendor, and all the vendee can conscientiously demand is the cost and expense of procuring the better title. This very case furnishes a striking and forcible illustration of the soundness and justice of the doctrine thus laid down. Goodloe, through Pintard, obtained title to a tract of land by an expenditure of nine hundred dollars, which was worth sixty-five dollars per acre, or more than ten thousand dollars; and if he can escape the payment of the purchase-money due from Rodes to Pintard, and which was assumed by Goodloe, he will pocket the last-mentioned sum, and obtain the rich fruits of Pintard's two years' labor on the land for nothing! Can this be tolerated? Can it be thought of? In Winlock v. Hardy, 4 Litt. (Ky.) 274, it was said, "that a tenant cannot deny the title of his landlord; nor can a person who enters upon land, in virtue of an executory contract of purchase, deny the right of him under whom he enters; for he is quasi a tenant, holding only in virtue of his vendor's title, and by his permission." See Turley v. Rodgers, 1 A. K. Marsh. 245; Logan v. Steele's Heirs, 7 T. B. Mon. 104; Tevis v. Richardson's Heirs. Id. 659; Fowler v. Cravens, 3 J. J. Marsh. 430.

Goodloe never placed himself in a situation to contest the title of Pintard. If upon the discovery of the defect in the title of the latter; if upon the cancellation of the pre-emption certificate, under the act of 1814, Goodloe had surrendered the land to Pintard, bonâ fide, he might, perhaps, have purchased a better title, and arrayed it in hostility to that of Pintard, and resisted the relief prayed for in the bill. This he did not do. He continued in possession; bought up a better title while in possession; nor is there any proof that he ever disavowed the title of Pintard, until the filing of his answer. 3 A. K. Marsh. 287. The case of Wilson v. Weathersby, 1 Nott & McC. 373, fully sustains this doctrine, and with regard to which it was said, in Willison v. Watkins. 7 Wheat. [20 U. S.] 53: "In the case of Nott & McC. 374, the court decide, that where a defendant enters under a plaintiff he shall not dispute his title while he remains in possession, and that he must first give up his possession and bring his suit to try titles. To the correctness of this principle we yield our assent, not as one professing to be peculiar to South Carolina, but as a rule of common law applicable to the cases of fiduciary possession before notice." Id. 54, 55, 56.

Goodloe, by holding the possession, and proving up a preëmption in his own name, prevented Pintard from complying with his covenant as to making title; and such being the fact, the familiar and well-settled principle applies, that if the obligee shall do any act to obstruct or prevent the obligor from performing his part of the contract, the obligor is thereby discharged from its performance; or, to speak more properly, the contract, as far as he is concerned, is in legal contemplation actually performed, and authorizes him to demand performance at the hands of the other party. Bac. Abr. tit. "Conditions," Q, 3; 3 Com. Dig. tit. "Condition," L, 6; Co.-Litt. 207; Pow. Cont. 417, 418, 419; Poth. Obl. 127. In the case of Marshall v. Craig. 1 Bibb, 395, which in many of its features was analogous to the present, it was laid down as a correct principle, abundantly established by authority, "that wherever a man by doing a previous act would acquire a right, if, owing to the conduct of the other party, he is prevented from doing it, he acquires the right as completely as if it had been actually done." See the case, from page 379 to 396, and authorities cited. In the cases of Majors v. Hickman. 2 Bibb, 217, and Carrell v. Collins, Id.

429, it is decided that he who prevents the performance of a condition cannot avail himself of the non-performance. 3 Com. Dig. "Condition," L, 7; Borden v. Borden, 5 Mass. 67; Clendennen v. Paulsel, 3 Mo. 230; Crump v. Mead, Id. 233. "If a purchaser," says Sugden, "takes possession under a contract, and he afterwards rejects the title, he must relinquish the possession." 2 Sugd. Vend. p. 23.

The same principle, as to obstructing or preventing the performance of a covenant, is applicable to the portion of the southwest fractional quarter of section six, township eighteen south, range one east; because Goodloe, by obtaining the bond of Benjamin Taylor from Tunstall, prevented Pintard from getting title to the part embraced in the bond, and which Goodloe says has been found to contain only eleven acres. For this, however, he acknowledges himself liable, and expresses his willingness to pay, and says he "never did refuse to pay." As to title to eleven acres of this section, as to his liability to Pintard therefor, Goodloe makes no contest, does not resist performance; but, on the contrary, recognizes Pintard's right to relief to that extent. Indeed, from the proof we are warranted in believing and assuming it as true, when taken in connection with his answer, that Goodloe has obtained the legal title. In his letter to Peter O'Flynn, employed by him as an agent to procure from Tunstall the bond of Benjamin Taylor, dated June 1, 1840, he says:—"I have purchased a tract of land of John M. Pintard, the same he purchased of Thomas T. Tunstall; the title is all perfect, except about twenty acres of the south-west fractional quarter of section six, township eighteen, range one east. Tunstall holds Benjamin Taylor's obligation to convey to a particular line known to the seller. Taylor is willing to convey, if Tunstall will send me the obligation. . . . I have the original contract between Pintard and Tunstall, handed to me by Pintard, as an order for the obligation on Taylor. Colonel Taylor's wife resides in Kentucky. If you will see Tunstall and forward me the obligation, directed to Richmond, Ky., I can have a deed acknowledged to bring down with me in September." Now, O'Flynn testifies that the obligation was procured by him from Tunstall and sent to Goodloe, and that Goodloe acknowledged the receipt thereof, and paid him for his services. The same fact is acknowledged in a letter from Goodloe to Pintard, dated November 10, 1840. As Taylor, who held the legal title, was willing to convey to Goodloe, provided Goodloe could obtain this bond from Tunstall; as Goodloe did obtain the bond in 1840; and as at the time of filing his amended answer, near five years afterwards, he acknowledged his liability to this extent, and did not even hint at any inability to obtain title, nor declare that he had not obtained it, I think we are bound to conclude that the deed, which he said he could procure from Taylor, had been procured, or that he had derived a title to this part satisfactory to himself, and thus entitling Pintard to compensation and relief. If he could not or had not obtained title, with the means in his hands to do so, he would most undoubtedly have insisted on it by way of defence in his answer. Under all the circumstances, silence is conclusive against him; but we have something more than that, namely, a distinct admission of liability, contained in his answer.

It may perhaps be said that Taylor ought to have been made a party to the bill. In the first place, I beg leave to remark that he was not materially interested in the suit; if he had any interest at all, it was only nominal, and no beneficial purpose could have been effected by making him a party. He was ready and willing, as Goodloe informs us, to convey, and in fact no decree could have been taken against him; he would have been at best but a passive party; and as he could do nothing necessary to the perfection of the decree, the court was fully warranted in proceeding without him. Joy v. Wirtz [Case No. 7,553]; Van Reimsdyk v. Kane [Id. 16,871]; Mallow v. Hinde, 12 Wheat. [25 U. S.] 193; Hoxie v. Carr [Id. 6,802]; Wormley v. Wormley, 8 Wheat. [21 U. S.] 451. But, in the second place, it is too late to make the objection in this court. It was an objection not taken at the hearing, either by demurrer, plea, or answer; and surely Goodloe cannot be allowed to surprise us with it now. Want of proper parties must be objected to by demurrer, or plea, or answer, and cannot be urged at the hearing. Mitf. Eq. Pl. 146; Milligan v. Milledge, 3 Cranch [7 U. S.] 320.

The next inquiry is as to the lien of Pintard for the unpaid purchase-money. The lien of a vendor of land against it is peculiar to a court of equity, and can be enforced only in that court. It exists as a charge or incumbrance on the land against the vendee and his heirs, and other privies in estate, and also against all subsequent purchasers with notice of the non-payment of the purchase money. It is wholly independent of possession on the part of the vendor, and attaches to the estate as a trust equally, whether it be actually conveyed, or only contracted to be conveyed. 2 Story, Eq. Jur. 462–467. "Where a vendor," says Sugden on Vendors (volume 3, pp. 182, 183, c. 18), "delivers possession of an estate to a purchaser without receiving the purchase-money, equity, whether the estate be or be not conveyed, and although there was not any special agreement for that purpose, and whether the estate be freehold or copyhold, gives the vendor a lien on the land for the money." And he cites, as sustaining these positions, Chapman v. Tanner, 1 Vern. 267; Pollexfen v. Moore, 3 Atk. 272; 1 Brown, Ch. 302, 424; 6 Ves. 483; Mackreth v. Symmons, 15 Ves. 329; Smith v. Hibbard, 2 Dickens, 730;

Charles v. Andrews, 9 Mod. 152; Topham v. Constantine, Tam. 135; Evans v. Tweedy, 1 Beav. 55; Winter v. Lord Anson, 3 Russ. 488. "So, on the other hand," says he, "if the vendor cannot make a title, and the purchaser has paid any part of the purchase-money, it seems that he has a lien for it on the estate." 3 Atk. 1; 2 Younge & J. 493; 3 Younge & J. 262. Thus proving that the lien does not arise nor depend upon perfect title. The term "estate" is used, which "imports," says Coke, "the interest which a man has in lands." Co. Litt. 345a; 4 Com. Dig. Estates, A, 1. According to Judge Story, "the principle upon which courts of equity have proceeded in establishing the lien in the nature of a trust is, that a person having gotten the estate of another, ought not in conscience, as between them, to be allowed to keep it and not to pay the consideration money. A third person, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payment, for it attaches to him also as a matter of conscience and duty." 2 Story, Eq. Jur. 465.

Did not Goodloe get the land through Pintard, and with full notice that the purchase-money was unpaid? Nay, did he not engage to pay that purchase-money himself? As long as he held the possession of the land thus acquired, could he resist this lien? It must certainly be manifest that he could not. The proposition is clear, that Pintard has a lien upon the land derived by Goodloe through him, which ought to be recognized and enforced. It is insisted in the answer, that the dwelling-house of Pintard was upon section six, and that he was not entitled to a preemption under the act of 1834. To this I reply, that whether he was or was not entitled to a preemption under that act, is not material to the support of his right to relief. But in fact he was so entitled. The dwelling-house which was there when Pintard purchased of Tunstall, in the spring of 1833, was probably situated on or near the meridian line which divides section six and section one; but the proof is clear, that all the other buildings, improvements, and cultivation were upon the southeast quarter of section one, or the large tract, and to which Goodloe subsequently proved up a preemption and obtained the legal title in his own name. Pintard was a settler or occupant of that tract, within the meaning of the act of 1834 (vide Instructions and Opinions, vol. 2, p. 589, No. 535; Id. p. 597, No. 543), and as such, most unquestionably entitled to a preemption.

Goodloe insists that of section six, sold to Rodes by Pintard, and by Rodes to himself, there was not enough embraced in the bond of Benjamin Taylor to make, with the other tract, two hundred acres; and that, upon ascertaining the boundaries and lines specified in the bond, it was found that it did not contain more than eleven acres. How it was ascertained, he does not state; and we only have his own assertion, without proof, that there was but eleven acres. From the proof, it appears that the portion of land thus described by boundaries in the bond must have amounted to more than eleven acres. That there was not two hundred acres in the whole, could be no ground for a rescission of the contract, if Goodloe were complainant; nor can it furnish any defence to a specific performance, when he is defendant. He obtained what he principally desired,—obtained the dwelling-house and all the other buildings, all the cleared lands, and all the improvements,—he obtained the principal object of his purchase; and, as there was no fraudulent misrepresentation or concealment on the part of Pintard, the case is a proper one for abatement in the amount of the purchase-money, to the extent of the small deficiency. This is well settled by authority. Newl. Cont. pp. 251, 252, c. 12; 2 Atk. 371; 4 Brown, Ch. 494; Drewe v. Corp, 9 Ves. 368; 7 Ves. 270; 6 Ves. 678; Calcraft v. Roebuck, 1 Ves. Jr. 221; Dyer v. Hargrave, 10 Ves. 505; 2 Story, Eq. Jur. 88; 1 Sugd. Vend. 506–508, 525, 526. If an estate be sold at so much per acre, and there is a deficiency in the number conveyed, the purchaser will be entitled to a compensation, although the estate was estimated at that number in an old survey. 1 Sugd. Vend. (6th Am. Ed.) pp. 525–535, c. 7, § 3, and notes and cases therein cited. Where the contract rests in fieri, the general opinion has been, that the purchaser, if the quantity be considerably less than it was stated, will be entitled to an abatement, although the agreement contain the words more or less, or by estimation. Id. 526; Hill v. Buckley, 17 Ves. 394; 1 Call, 313; Stebbins v. Eddy [Case No. 13,342].

The utmost that Goodloe could claim would be an abatement for the deficiency. Goodloe has waived his right, if any he ever had, to object to Pintard's title. His letters, after having proved up a preemption in his own name, and especially the payment made by him to Pintard on the 31st of May, 1839, of $1,363.82, amount to a waiver. The preemption having been proved up on the 15th February, 1839, this payment was made more than three months afterwards. The letters alluded to, beginning in January, 1840, and ending in October, 1841, embrace a period of near two years; and when that payment and these promises to pay are taken into consideration, there could hardly be more conclusive evidence of such waiver. 2 Sugd. Vend. 10–14; Margravine of Anspach v. Noel, 1 Madd. 310; 2 Swanst. 172; 3 Younge & C. 291.[3]

---

[3] This argument was prepared by Mr. Hempstead, printed, and filed in the supreme court; but as he had not been admitted in that court, it was signed by Mr. Foote and Mr. Sebastian, and appears in the case as positions for which "the counsel for the appellee contended." 12 How. [53 U. S.] 28–36.

F. W. Trapnall and Daniel Ringo, for Tunstall.

Albert Pike, for Goodloe.

We insist, that in this case, this court has no jurisdiction of the subject-matter of the suit; and this upon the ground that it plainly appears to be a case in which a court of equity can have no jurisdiction whatever. The only ground on which the aid of a court of chancery is here invoked, is, that the complainant has a lien on certain lands, sold by him to Rodes, and by Rodes to Goodloe, for the unpaid purchase-money. We think there is no such lien, and that being the case, nothing is presented but a mere legal demand for money, with which a court of equity has nothing to do. The bill alleges, that on the 1st of April, 1834, complainant purchased of the defendant Tunstall the north-east fractional quarter of section twelve, and the south-east quarter of section one, in township eighteen south of range one west, claimed by Tunstall under the preëmption act of 1814; and also a part of the south-west fractional quarter of section six, in township eighteen south of range one east. That in April, 1833, he sent a young man and two negroes on the land, and moved to and settled on it with his family in November, 1833. That on the 23d of March, 1835, he sold to Rodes the north-east quarter of section one, and so much of the south-west fractional quarter of section six, as made with it two hundred acres of land, embracing the front lands, at forty dollars an acre, to be paid in 1836 and 1837; and Rodes gave him his two notes for the purchase-money, on which some payments have been made. That when he sold to Rodes, he gave him possession of the land and the improvements thereon; a dwelling-house being on the land, and part of it cleared prior to April, 1833, and the land being in cultivation in 1833 and 1834. That on the 13th of March, 1837, Rodes sold the same land to Goodloe at sixty-five dollars per acre; and by the contract made between them, Goodloe was to pay complainant the amount due him by Rodes, as soon as a complete title should be made to him. That Goodloe has made some payments on the notes and promised to pay the residue. That the preëmption claimed under the act of 1814, was afterwards decided to be invalid; and Goodloe, of his own motion, proved up and established a preëmption to the south-east quarter of section one, under the act of 1838, in his own name, and by virtue of it, entered and purchased that tract of land. In regard to the south-west quarter of section six, he states that one Benjamin Taylor, of Chicot county, Arkansas, holds the legal title to it. That he gave one John T. Bowie his bond for title to part of it, and Bowie assigned and delivered the bond to Tunstall; that Goodloe has bought the bond from Tunstall, and so prevents complainant from getting legal title to that tract. The bill prays a correction of certain alleged mistakes in the title papers,—that the lands may be subjected to payment of the purchase-money,—and that Taylor's bond may be given up, so that the complainant may procure the legal title, and comply with his contract made with Rodes. Rodes is averred to be a non-resident, and not a citizen of the state of Arkansas; and it is expressly averred that when complainant sold, the title to the south-east quarter of one was in the United States, and is now in Goodloe by purchase from the United States; and the title to the south-west quarter of six was and is in Benjamin Taylor.

The answer of Goodloe admits that Tunstall sold to Pintard, Pintard to Rodes, and Rodes to him, as alleged; that Pintard gave Rodes possession as alleged, and that respondent has paid Pintard $1,963.82 on Rodes's notes. It avers that Pintard had no title to the south-east quarter of one, but a mere claim under the preëmption act of 1814, which was set aside; that he afterwards proved up a preëmption in his own name, and entered the land, and has obtained a patent for it. As to the south-west quarter of six, he alleges that Taylor has the legal title to it; that he never gave John T. Bowie any bond for it, but that he did execute a bond to Resin Bowie; that on getting a patent for that tract, he would convey to Tunstall a patent, supposed to contain about ten acres, more or less, by certain boundaries; by which boundaries the quantity to be conveyed is only eleven acres. The quantity of land in the south-east quarter of one is stated at $168^{96}/_{100}$ acres. He denies that Pintard settled on the place in 1833, nor until 1834, though in 1833 he had a negro on it, and a white man who died there. He admits that Pintard had made improvements on the land when he sold to Rodes; but that he never did reside on the south-east quarter of one, but his dwelling-house and residence was always on the other tract.

The agreement of counsel, and the evidence taken in the case, show that Pintard took possession of the land early in 1833; placed hands upon it, improved and cultivated it, and moved on it in the fall of that year. We have not noticed the allegations or evidence in regard to Goodloe's promises to pay Pintard, because they are not material to the questions which we propose to discuss. We have no objection to admit that Pintard might sustain an action at law against Goodloe for the money due him, after making him complete title to the lands in question. That will only prove that he can have his action in another forum.

The case shows that Pintard sold two tracts of land. The title to one was in the United States, and he never obtained any title whatever to it. He was a mere trespasser on it. Goodloe has since purchased and entered it. That his improvements on it were a good consideration for the notes may or may not be true; with that we have nothing

to do in the present case. The title to the other was in a third person, Taylor. Taylor contracted to convey to Resin Bowie part of that tract, about ten acres; but no bond or deed from Bowie to Tunstall, who sold to Pintard, is shown. The title of Pintard to that tract wholly fails. He now claims by his bill a lien on the first tract, and enough of the second to make up 200 acres, and for a decree of sale of said lands, for payment of his purchase-money. Is he entitled to it? Has he any lien?

As a preliminary matter, he remarked:— First. That there is a want of jurisdiction as to Rodes, because the bill shows him to be a non-resident of Arkansas, and there has been no service on him in the case. Second. That it is a still more fatal objection that the bill seeks a sale of land, the title to which is in Taylor, without making him a party. How can his land be sold unless he be made a defendant? In fact, what land is it? How much, and what part of the tract? His obligation is to convey to Resin Bowie about ten acres. What obligation is shown to rest on him to convey to Pintard? Ought not Resin Bowie to be also a defendant, or is this court to dispose of the rights of both of these parties when neither of them is before it? Again, Goodloe is only bound to pay forty dollars per acre, when complete title is made to him. How can a decree go against him for the purchase-money on the Taylor land, when the title is still, and may perhaps always remain, in Taylor? Does the court even know for how much the decree ought to go? The first business of Pintard should have been to get title to this part of the land, before he could claim to have it sold, or assert a right to any purchase-money for it. As far, therefore, as the south-west quarter of six is concerned, we may spare all further remark. As to that, Taylor should have been a party; so should Bowie. And, as the evidence shows that Pintard never had any title, and that the title is still in Taylor, except Bowie's equitable right to ten or eleven acres, as to this tract the bill cannot be sustained.

Does it show any lien on the other tract, which this court, exercising the ordinary power of a court of chancery, can enforce? Pintard sold government land on which he was a mere trespasser. His claim to it failing, the purchaser's assignee entered and paid for the land. He takes his title through the United States. He may be bound, at law, to pay Pintard a stipulated price, or he may not. That is not the question. His promises may be binding on him; if so, they are binding at law, and give a legal right of action. Has he a lien on the land? If so, how was it created, and on what principles of law does it depend? If there is no lien, there is no equity. A lien is not, in strictness, either a jus in re, or a jus ad rem, that is, it is not a property in the thing itself, nor does it constitute a right of action for the thing. Liens necessarily suppose the property to be in some other person, and not in him who sets up the right. See Story, J., in Ex parte Foster [Case No. 4,960]; Lickbarrow v. Mason, 6 East, 21, 24, note. Now certainly there can be no lien without an estate to support it. The lien of a vendor for unpaid purchase-money is in the nature of a reservation. It springs out of the estate of the vendor himself. If he had nothing to convey, if nothing passes by his deed, he can reserve no lien. The lien is a right to have the land sold for payment of the debt. If the land did not belong to the vendor, he certainly could not reserve a right to have it sold. When he undertook to sell the land, it belonged to the United States. Of course, no lien was created at that time. Did any spring up when Goodloe purchased from the United States? If A. sells to B. land which belongs to C., of course he has no lien for the purchase-money. If B. afterwards buys of C., does a lien accrue to A.? Certainly not. Upon what principle? The lien is a reservation. If A. had nothing to grant, he had nothing to reserve. Thus Chancellor Kent says, in Garson v. Green, 1 Johns. Ch. 309: "The vendor has a lien on the estate for the purchase-money, while the estate is in the hands of the vendee, and when there is no contract that the lien by implication was not intended to be reserved." The vendor can have his lien only upon what he sells. In this case he sold no interest in the land, because he had none. If the notes were based on any solid consideration, it was the value of his improvements, and the benefit of his labor which has been enjoyed by the defendant. This is what he sold—his labor and improvements—not any present interest in the land, but something past and done, the fruits of which defendant enjoyed. This is the estate which he sold. Could there be any lien on such an estate? The notes may be sustained, or may not, as based on a solid consideration; but this gives no lien on land in which Pintard had no interest.

No such case as the present is to be found in the books. In every case where the question of lien has arisen, the vendor had conveyed, or contracted to convey, away the estate. Admit that Pintard sold his improvements, and the United States sold the land; by what process can his debt for the improvements descend upon and become a lien on the land? The idea is absurd. The English cases will be found reviewed in Mackreth v. Symmons, 15 Ves. 329. Later cases are Smith v. Hibbard, 2 Dickens, 730; Topham v. Constantine, Tam. 135; Winter v. Lord Anson, 3 Russ. 488; Clarke v. Royle, 3 Sim. 499. They are all considered in Gilman v. Brown [Case No. 5,441]. Other American cases will be found in all the books of reports; and there is not a single case which gives any countenance to the attempt made by this bill. The vendee, say the books, becomes, to the extent of the purchase-money, a trustee for the vendor. 2 Story, Eq. Jur. 463. On what ground shall A. hold in trust for B. an estate

which he did not purchase from or obtain through him? The principle is, that if I part with my property to another, it shall stand charged with the purchase-money. But if the property is not mine, and he has to buy it of another, with what face can I pretend to charge it? The principle on which courts of equity have proceeded, in establishing this lien, in the nature of a trust, is, that a person having gotten the estate of another, ought not, in conscience, as between them, to be allowed to keep it, and not to pay the consideration money. Goodloe has not got the estate of Pintard, because the land never was Pintard's. He was a mere trespasser on it without title. Id. 465.

We are aware that the bill has an equitable aspect. But we desire again to remark, lest we may be misunderstood, that we are arguing simply the question whether this is the proper forum in which Pintard should prosecute his claim against Goodloe; and that we are not now denying that he has a legal demand against him. He has clearly mistaken his forum. He is asking this court to give him a lien on property which he never owned, and consequently could never sell. Goodloe has promised Rodes, and perhaps Pintard, to pay the debt due by the former to the latter, whenever he should obtain from Pintard complete title to the land. If he is in default, if his promise is binding on him, and the time for its performance has come and passed, let him be impleaded in the proper forum, and he will answer. But there is clearly no lien, and, therefore, no equity. An application so novel to a court of chancery ought not to be entertained, and this new stride in equity jurisdiction will not, we are sure, be taken by this honorable court.

Before DANIEL, Circuit Justice, and JOHNSON, District Judge.

JOHNSON, District Judge. The material facts shown by the pleadings and evidence in this case are as follows:—

That on the first day of April, 1834, the complainant Pintard purchased of the defendant Tunstall, as evidenced by a writing under the hand and seal of Tunstall, the south-east quarter of section one, in township eighteen south of range one west, and a part of the south-west fractional quarter of section six in township eighteen south of range one east, for the consideration of 1,500 dollars, paid by Pintard to Tunstall. An improvement having been made on the south-east quarter of section one, Tunstall claimed a preëmption right thereto under the preëmption act of 1814, was in the possession thereof, and transferred and delivered possession to Pintard, and bound himself to convey the same by a good and sufficient title, so soon as the patent issued from the president of the United States. That on the 24th day of July, 1834, a preëmption right and a certificate of purchase was granted and issued to said Tunstall for such quarter section of

land under the preëmption act of the 12th of April, 1814, by the land-officers at Little Rock. That Pintard resided on said land during the year 1834, built additional houses, extended the clearing, and cultivated seventy or eighty acres during that year. That, being so in possession of said land, Pintard, on the 23d day of March, 1835, bargained and sold to William Rodes the said quarter section of land and so much of said south-west fractional quarter of section six adjoining thereto, as would make the quantity of two hundred acres, at and for the price of forty dollars per acre, binding himself in writing to convey the same by a general warranty deed so soon as the patents could be procured; and, to secure the payment of the purchase-money, said Rodes executed his two promissory notes for $4,000 each, the first due and payable on the 1st of March, 1836, the second due and payable one year thereafter; and thereupon Pintard delivered possession of said land, and improvements thereon, to said Rodes. That subsequently the said Rodes, by a contract in writing, signed by himself and the defendant Goodloe, on the 13th March, 1837, bargained and sold the said tracts of land and improvements thereon to said Goodloe, for the sum of sixty-five dollars per acre, the said Goodloe stipulating in said contract to pay, as part of the price, the purchase-money due by said Rodes to Pintard, as soon as the title with general warranty should be made to him. Rodes thereupon delivered possession of said tracts of land and improvements to Goodloe, who has held the same ever since. That on the 24th of February, 1838, the said preëmption right and certificate of purchase, by Tunstall, was declared to be null and void by the commissioner of the general land-office at the city of Washington, upon the ground that the land was not the property of the United States until the ratification of the treaty with the Quapaw Indians, on the 24th of August, 1818, and directed the land-officers at Little Rock to refund the said Tunstall the purchase-money paid by him. That on the 9th of April, 1840, Goodloe obtained a preëmption right in his own name for said quarter section of land, by virtue of his occupancy thereof, under the preëmption act of the 22d of June, 1838 [5 Stat. 251], and on the 3d day of March, 1841, obtained a patent therefor from the president of the United States. That on the 28th of March, 1838, Goodloe paid to Pintard $600, and on the 31st of May, 1839, the further sum of $1,-363.82, for which credits are indorsed on one of the promissory notes executed by Rodes to Pintard, for the purchase-money of said land, and no other or further payments have been made by Rodes or Goodloe in discharge of said two promissory notes. It is admitted that Rodes resides in Kentucky, and is utterly insolvent. From the proof in the case it is difficult to ascertain the precise quantity of land contained in the south-west frac-

tional quarter of section six, which Pintard sold to Rodes, and Rodes to Goodloe; but taking the bond of Benjamin Taylor to Tunstall for its conveyance, and the admission of Goodloe in his answer, as the best evidence, there appears to be about eleven acres; Goodloe having obtained possession of Taylor's bond to Tunstall for the conveyance of said land, he seems to admit his liability to Pintard to that extent, and avers that he has more than paid for the same.

This bill is filed by Pintard, praying a decree against Goodloe for the remainder of the purchase-money due him for said tracts of land, and claiming a lien thereon to have them subjected to sale for the payment of said money. Upon the foregoing facts and circumstances two questions arise: First, is Goodloe personally liable to Pintard for the purchase-money agreed to be paid by Rodes; and secondly, has Pintard a lien upon the lands for the payment of the purchase-money yet unpaid? It may be material to remark, that Goodloe, having purchased and received possession of the land from Rodes, who had purchased and received the possession from Pintard, Goodloe holds the lands under Pintard, and there exists a privity of estate between them. Pintard and Goodloe stand in the relation of vendor and vendee of the estate. The principal ground upon which Goodloe resists the payment of the purchase-money to Pintard is, that Pintard never had any good and valid claim or title to the land, either in law or equity, and therefore is not entitled to demand and receive the consideration agreed to be paid. Pintard purchased the land of Tunstall, who gave him his bond for the conveyance of the legal title so soon as it could be obtained from the United States. Tunstall claimed the land as a preëmption right under the preëmption act of 1814, and on the 24th day of July, 1834; and before Pintard sold to Rodes, a right of preëmption and certificate of purchase was granted and issued to Tunstall for the said south-east quarter of section one, by the land-officers at Little Rock. Subsequently to Pintard's sale to Rodes, and Rodes' sale to Goodloe, namely, on the 24th day of February, 1838, this right of preëmption and certificate of purchase was declared to be null and void by the commissioners of the general land-office. The title, then, under which Pintard held the land, was defective and invalid. But Goodloe, instead of claiming a rescission of his contract, and surrendering possession of the land, which he had a perfect right to do, continued to hold it, applied for and obtained a preëmption right thereto in his own name, by virtue of his occupancy, and has obtained the legal title from the United States.

Under these circumstances, the doctrine is well established that Goodloe is to be considered as a trustee for Pintard, under whom he held the land, and that all acts done by him to perfect the title while in possession,

enure to the benefit of Pintard. The vendor and vendee, and assignees and purchasers from the vendee, stand in the relation of landlord and tenant, neither the vendee nor the purchasers from him are permitted to disavow the vendor's title; and where they buy up a better title than that of the vendor, and the latter has been guilty of no fraud, the vendor can only be compelled to refund the amount of money paid for the better title. This doctrine is clearly held by the supreme court of the United States in the case of Galloway v. Finley, 12 Pet. [37 U. S.] 295.

The case of Searcy v. Kirkpatrick (Cooke [Tenn.] 211) decided by the supreme court of Tennessee, is in all its important and material features precisely analogous to the present case. Searcy had made an entry of two hundred and twenty-eight acres of land, by virtue of a military warrant, which land he afterwards sold and covenanted to convey to Kirkpatrick. Some person fraudulently appropriated the warrant to his own use, in consequence of which Searcy was unable to obtain a grant for the land. Upon the sale Searcy delivered the possession of the land to Kirkpatrick, who continued to hold it, and finding out the condition of Searcy's title, he made an entry of this land, as an occupant, in his own name, and obtained the legal title from the state. He afterwards brought a suit at law against Searcy on his covenant to convey, and recovered damages to the amount of $1,700. Searcy filed a bill in chancery to enjoin this judgment, and the court decreed a perpetual injunction thereto, upon the payment by Searcy to Kirkpatrick of the sum he paid and expended in obtaining the title in his own name. Judge White, in giving the opinion of the supreme court, says: "If a man, under the belief that he has a good title to a tract of land, sells it, and either conveys or stipulates to convey it, putting at the same time the vendee in possession, and the vendee discovering a better title in some other person, purchases it with a view to prejudice the vendor, a court of equity will view the purchase as made for the benefit of the vendor, through the agency of his vendee, and will relieve the vendor from the obligation of his covenant by paying the money, with interest, which the vendee has advanced in purchasing up the preferable title." In the present case Goodloe became entitled to a right of preëmption by virtue of his possession and occupancy derived through Rodes from Pintard. Had he surrendered the possession when he discovered the defect in Pintard's title, Pintard might have obtained by his occupancy a valid title to the land. By holding the possession Goodloe has prevented Pintard from acquiring a title to the land, and it would be highly inequitable and unjust to withhold from him also the consideration for which he sold it. Another ground of objection on the part of

the defendant Goodloe, to his liability for the purchase-money to Pintard, is, that his promise to ·pay was not made to Pintard, but to Rodes. It is true that he entered into no contract with Pintard, but in his written contract with Rodes, by a fair construction of its terms, he expressly bound himself to pay to Pintard the purchase-money due by Rodes, so soon as a good title should be made to him. It can hardly be doubted that this undertaking, made upon a valuable consideration, in discharge of his debt to Rodes, and of Rodes's debt to Pintard, will be enforced in a court of equity. It is consonant to the principles of equity and justice, and I know of no technical objections to its enforcement.

The conclusion at which I have arrived is, that Goodloe is personally bound to Pintard for the payment of the purchase-money due him for the land, after deducting the amount paid by Goodloe for the better title, to the United States, and all expenses incident to the procurement of that title.

The remaining question is, had Pintard a lien on the land sold by him so as to subject it to sale, if necessary, for the payment of the purchase-money due him for sale? No doctrine is more firmly established by a uniform current of decisions, than that the vendor of the land has a lien on the land for the amount of the purchase-money, not only against the vendee himself and his heirs and other privies in estate, but also against all subsequent purchasers having notice that the purchase-money remains unpaid. To the extent of the lien, the vendee becomes a trustee for the vendor and his heirs; and all other persons claiming under them, with such notice, are treated as in the same predicament. The principle upon which courts of equity have proceeded in establishing this lien in the nature of a trust is, that a person having gotten the estate of another, ought not in conscience, as between them, to be allowed to keep it and not pay the consideration money. A third person having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payment, for it attaches to him also as a matter of conscience and duty. It would otherwise happen, that the vendee might put another person into a predicament better than his own, with full knowledge of all the facts. See 2 Story, Eq. Jur. 463, and the authorities there cited. The lien attaches as a trust, whether the land be actually conveyed or contracted to be conveyed. 2 Sugd. Vend. 541; Smith v. Hibbard, 2 Dickens, 730.

Pintard, then, has a lien upon the lands sold by him, in the hands of the defendant Goodloe, for the payment of the purchase-money remaining unpaid with the abatement before stated. The amount paid and expended by Goodloe in obtaining the title to the land from the United States does not definitely appear from the evidence in the

cause; and, indeed, it would not be expected that he could show with certainty all the expenses to which he was put in procuring said title. In his answer, he states the sum amounted to nine hundred dollars. I think it reasonable to allow this amount. It appears that on the 26th of January, 1840, Goodloe loaned to Pintard two hundred dollars, for which a note was given, and is filed in this case; and it is admitted by Pintard, as a just credit, to be allowed to Goodloe.

From the bill, answers, exhibits, and proofs in the cause, the court is of opinion that the complainant is entitled to the relief prayed for in his bill of complaint.

Decree: It is ordered and decreed that the said defendant, Archibald W. Goodloe, do pay to said John M. Pintard the sum of ten thousand five hundred and fifty-two dollars, together with ten per cent. interest per annum thereon, from rendition of this decree. till paid; which sums, after deducting all the credits before mentioned, to which said Goodloe is entitled, is found by the court here to be due from said Goodloe to the said Pintard.as the balance of the purchase-money for the lands mentioned in the pleadings in this case. And it is further ordered and decreed, that the said south-east quarter of section one, in township eighteen south of range one west, and eleven acres adjoining thereto, being the same sold by said Pintard to William Rodes, and by Rodes to Goodloe, in the south-west fractional 'quarter of section six, in township eighteen south of range one east, be and the same is hereby charged with the said sum of ten thousand five hundred and fifty-two dollars, and accruing interest, as a lien for said purchase-money; and that unless the said defendant, Archibald W. Goodloe, shall pay to the complainant, John M. Pintard, the said sum of money, with the accruing interest, on or before the first day of November, then and in that case, it is further ordered and decreed, that the lands just mentioned, or so much thereof as may be necessary to pay the sum before mentioned, be sold by a commissioner appointed by this court, to the highest and best bidder for cash in hand, at the court house, in the town of Columbia, Chicot county, state of Arkansas, after the said commissioner shall have advertised the same four weeks successively, in some newspaper printed in this state, and shall have put up advertisements thereof at the said town of Columbia, and three other public places in said county of Chicot. And that the said commissioner, out of the proceeds of said sale, if sufficient therefor, shall pay, in the first place, all proper and legal expenses attending the execution of this decree. Secondly, shall pay to the complainant, or to his solicitors of record, the amount of principal and interest hereby awarded and decreed to the complainant; and thirdly, shall pay over to the defendant Goodloe, or to his

properly authorized agent. any balance which may remain in his hands after satisfaction of the amount of the principal, interest, and charges aforesaid. and shall moreover deliver to the purchaser possession of the lands, and convey the same to him by and in fee-simple. to him and his heirs for ever, and shall make report of his proceedings in the premises to this court at the next term thereof; and liberty is hereby reserved to the complainant to apply from time to time to the court for such further and other proceedings as may be necessary for the execution and carrying into complete effect the decree herein pronounced. And it is further ordered, that Johnson Chapman, of Columbia, in this state, is hereby appointed a commissioner for the purposes before mentioned, who shall be furnished with a certificate copy of this decree, which shall be to him a sufficient warrant for action in the premises. And the question of costs is reserved until the further order of this court herein.

The bill as to Rodes and Tunstall dismissed.

Mr. Justice DANIEL concurred in the foregoing opinion and decree.

From this decree, Goodloe entered into an appeal bond to stay the execution of the decree, took a transcript, and removed the case into the supreme court. Having departed this life during its pendency there, it was revived against Joseph P. Thudgill, his administrator.

[The decree was affirmed by the supreme court. 12 How. (53 U. S.) 24.]